G

**FILED & ENTERED**

APR 20 2026

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY llewis     DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

In re:

Forrest Kent Balmain,

Debtor.

Case No.:     2:25-bk-14931-NB

Chapter:     11

**MEMORANDUM DECISION VALUING PROPERTY**

Evidentiary Hearing:
Date:  October 30, 2025
Time:  9:00 a.m.
Place: Courtroom 1545
          255 E. Temple Street
          Los Angeles, CA 90012

## 1. INTRODUCTION

At issue is the value, for plan confirmation purposes, of Debtor's primary residence, located at 11435 Frascati Street, Agua Dulce, CA 91390 (the "Property"). After concluding an evidentiary hearing as set forth in the caption above, this Court strongly encouraged the parties to attempt to settle the matter, explaining that a settlement could likely afford the parties a greater range of options – including, for example, greater flexibility in any plan with respect to claim classification and interest rate as compared to the treatment mandated by the Bankruptcy Code outside of settlement.  While it appears that the parties made a diligent effort to reach a

-1-

settlement, they ultimately were unable to resolve their differences.[1]  Accordingly, this Memorandum Decision values the Property at $1,040,237.00 as of the date of the above-captioned Evidentiary Hearing.

**2. FINDINGS OF FACT[2]**

    **a. Overview**

Shortly after acquiring the Property, Debtor initiated a major remodeling project.[3] Unfortunately, the substandard work performed by his general contractor created significant issues requiring extensive remediation.  And since the remodeling job was only partially completed, substantial additional work will be required to finish the project.  After commencing litigation against his prior general contractor, Debtor obtained a settlement of $20,000.00.  (Debtor testified that he "had no choice" but to accept a low settlement amount in view of the contractor's threats of filing for bankruptcy.)

Debtor and Creditor do not meaningfully dispute what the value of the Property would be if the problems created by the prior contractor were to be corrected and the remaining remodeling work were to be completed.  They do, however, disagree on the amount of work required to make the repairs and complete the remodeling.  Debtor also contends that when he purchased the Property, he was not aware of certain additional pre-existing defects, which Debtor testifies he discovered only during the course of the botched remodeling project.  Debtor's position is that the cost of fixing these alleged defects will be significant, further reducing the value of the Property.  Creditor questions whether any pre-existing defects exist at all and contends that, to the extent they do, the costs of correction will be minimal.

---

[1]    This Court conducted status conferences to monitor the progress of settlement negotiations on November 18, 2025, December 16, 2025, and January 6, 2026.

[2]    This Memorandum Decision constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52 (Fed. R. Civ. P., made applicable by Rule 7052, Fed. R. Bankr. P.).  To the extent any findings of fact should more properly be considered conclusions of law, they shall be deemed as such, and to the extent any conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

[3]    To reduce costs, this Court did not require the parties to obtain and submit transcripts of the evidentiary hearing.  Findings of fact that are not supported by a footnote reference are based upon testimony introduced at that hearing.

**b. Permitting issues**

At the heart of the dispute is whether substantial prior modifications to the Property were properly permitted.  Debtor testified that at some point during the remodeling process, a county inspector verbally advised him that extensive unpermitted work on the Property had been performed, and that as a result he would be required to restore the Property to its original condition by removing the unpermitted work. According to Debtor, to bring the Property into compliance, he would be required to:[4]

    (1) Reverse unpermitted alterations to the garage and driveway by returning an unauthorized fifth bedroom to its original function as a third garage bay and removing an unauthorized redesigned driveway now blocking access to what had formerly been the third garage bay;[5]

    (2) Restore an exterior balcony to its former condition by removing an unauthorized sunroom enclosure that had converted exterior space into an additional interior room;[6]

    (3) Remove an unpermitted shower room;[7]

    (4) Remove an unpermitted kitchen on the first floor and restore the space to its original function as a laundry room;[8]

    (5) Repair a collapsed drain line under the living room;[9]

    (6) Relocate HVAC ductwork blocking access to the attic;[10] and

    (7) Dig a new well to replace the dry existing well.

---

[4]    Debtor testified that all of the following repairs were necessary, both in a declaration submitted prior to the evidentiary hearing (dkt. 49, PDF pp. 5:11–6:17) and at the evidentiary hearing itself.  In addition, as further explained below, Creditor's expert witness George Sorkin testified that he conducted an in-person inspection of the Property, and at that inspection, Debtor advised him of various alleged permitting issues.  The expert report that Mr. Sorkin prepared (Creditor Ex. C (dkt. 66-3), the "Sorkin Report") contained detailed estimates of how much it would cost to rectify the permitting issues alleged by Debtor.  Because the Sorkin Report is more detailed than the corresponding evidence introduced by Debtor, the list of repairs has been supplemented with annotations to relevant sections of the Sorkin Report.

[5]    Sorkin Report (Creditor Ex. C (dkt. 66-3)) PDF pp. 9–11 &

[6]    *Id.* at PDF pp. 4 & 19.

[7]    *Id.* at PDF pp. 7 & 29.

[8]    *Id.* at PDF pp. 7 & 25.

[9]    *Id.* at PDF pp. 8 & 27.

[10]    *Id.* at PDF pp. 4 & 20.

Debtor did not produce any written documentation to substantiate his claims with respect to the foregoing alleged permitting issues.  George Sorkin, an expert witness offered by Creditor with approximately fifty years' experience in the construction industry, testified that it would be highly unusual for an inspector who identified code violations at a property to fail to create a written memorialization of those violations.  Mr. Sorkin further testified than when he visited the Property to conduct an inspection, he asked Debtor to provide him with any permitting-related documentation, but Debtor stated that he had none.  Even contractor Sergio Adolfo, who testified on Debtor's behalf as to the costs of remediating the alleged permitting violations, conceded on cross-examination that Debtor never provided him with any official documentation regarding the alleged violations, and that in his experience the absence of such documentation was atypical.

Most damaging to Debtor's credibility as to the permitting issue was Mr. Sorkin's testimony that his research revealed that in 2022, the county had in fact issued permits authorizing (A) conversion of the third garage bay into a bedroom, (B) conversion of the exterior upstairs balcony into an enclosed interior sunroom, (C) modification of the attic HVAC system, and (D) various other work.  Mr. Sorkin authenticated records from a Los Angeles County online database showing that all of the foregoing permits had been issued.[11]  He testified that based upon the time of issuance, the permits could only have been obtained either by Debtor or Debtor's prior general contractor.  Mr. Sorkin's conclusion was that appropriate permits had in fact been issued for all the work that Debtor asserted was unpermitted.

This Court finds that Debtor has failed to establish, by a preponderance of the evidence, that substantial unpermitted work was performed at the Property.  It follows that Debtor has also failed to establish that significant costly repairs are required to restore the Property to its original condition.  As discussed below, that means that many

---

[11]    Creditor Ex. G (not docketed).

of the most expensive repairs identified by Debtor are either not necessary at all or will cost far less than set forth in Debtor's estimates.

### c. Modifications to the driveway and third garage bay

The single most costly repairs that Debtor alleged were necessary pertain to the driveway and the third garage bay.  The photograph below shows the current state of these areas of the Property (explanatory red arrows and annotations have been added by this Court):



As noted above, Debtor's position is that to bring the Property into compliance with permitting regulations, the entire new section of the driveway and the entire new retaining wall (both shown in the photograph above) must be removed in order to restore vehicle access to the area that originally functioned as the third garage bay.

Debtor further asserts that the converted fifth bedroom must be returned to its original use as a third garage bay.  As the photograph illustrates, performing these modifications would require regrading the entire upwardly sloped section of the driveway on left to make it level with the original flat driveway on the right.  Finally, according to Debtor, after all these tasks were completed, a new retaining wall – this time on the far left side of the newly regraded driveway, instead of in the middle of the two driveways as shown in the photograph – would have to be installed.  Debtor's expert, Sergio Adolfo, testified that performing all this work would cost $148,252.00.[12]  Mr. Adolfo explained that the high cost was attributable to the large amount of soil that had to be removed and the length and height of the new retaining wall.

The report prepared by Creditor's expert, Mr. Sorkin (the "Sorkin Report") estimated that it would cost $69,944.00 to replace and regrade the new section of the driveway and build a new retaining wall and $9,016.00 to return the remodeled bedroom to its original function as a third garage bay.[13]  Mr. Sorkin included these estimates in his report because when he inspected the Property, Debtor represented to him that the foregoing alterations were necessary to bring the Property into compliance with permitting regulations.  But as discussion in Section "(2)(b)," above, after inspecting the Property Mr. Sorkin embarked upon a further investigation which revealed that permits for the alterations had been previously obtained, meaning that at least with respect to the driveway and garage, the costly worked identified by Debtor is completely unnecessary.

**d. Removal of the sunroom enclosure and restoration of the exterior balcony**

Based upon Debtor's incorrect representation that the sunroom enclosure had not been permitted and therefore had to be returned to its prior condition as an exterior balcony, the Sorkin Report put the cost to "[c]onvert [i]llegal [r]oom [b]ack to [b]alcony"

---

[12]     Adolfo Decl. (dkt. 71) p. 2 (¶ 6).
[13]     Sorkin Report (Creditor Ex. C (dkt. 66-3)) PDF pp. 9–11 (restoration of driveway) and PDF p. 28 (restoration of third garage bay).

at $11,277.00.[14]  The Los Angeles county permitting records authenticated by Mr. Sorkin indicate that in 2022, a permit was issued to "enclose … deck and convert to 200 sf sunroom (glass enclosure) …."[15]  Accordingly, this Court determines that because the sunroom is permitted, there is no reason to deduct from the Property's value the costs of restoring the sunroom to its initial condition as an exterior balcony.

**e. Modifications to the HVAC system**

Debtor and Creditor agree that modifications to the HVAC system are necessary to bring the Property into compliance with permitting requirements, but disagree as to the scope of those modifications.  The problem, as described in the Sorkin Report, is that during installation of the HVAC system, an air return duct was relocated to a space that was supposed to provide access to the attic.[16]  Creditor's position is that the problem can be fixed simply by redirecting the ductwork through its original chase to the lower floor, for a cost of $1,048.00.[17]  By contrast, Debtor's expert, Mr. Adolfo, testified that restoring attic access required relocating the entire HVAC system, at a cost of $29,250.00.[18]

This Court finds Mr. Sorkin's estimate to be more convincing.  According to the Sorkin Report, attic access could be restored by "[r]erouting the air return duct from its current position … to the original place on the first floor," using "the original chase to relocate and move the air return register," and "[s]ecur[ing] and seal[ing] the new ducting."[19]

Mr. Adolfo did not offer a plausible explanation as to why the straightforward solution advocated by Mr. Sorkin would not suffice to restore attic access.  Instead, his only testimony at the evidentiary hearing with respect to the HVAC system issue was that the system was not located in the "right place."  Mr. Adolfo's written declaration

---

[14]    *Id.* at PDF p. 19.
[15]    Creditor Ex. G p. 1 (not docketed).
[16]    Sorkin Report (Creditor Ex. C (dkt. 66-3)) at PDF p. 4.
[17]    *Id.*
[18]    Adolfo Decl. (dkt. 71) p. 2, 6, & 8.
[19]    Sorkin Report (Creditor Ex. C (dkt. 66-3)) at PDF p. 20.

testimony and supporting expert report was likewise devoid of any detailed rebuttal to Mr. Sorkin's much cheaper solution.

**f. Other differences between the repair estimates prepared by Mr. Sorkin and Mr. Adolfo**

To resolve the remaining differences between the repair estimates offered by Mr. Sorkin and Mr. Adolfo, this Court relies primarily upon its assessment of the credibility of both witnesses.  In that regard, the testimony of Mr. Sorkin is entitled to greater weight than that of Mr. Adolfo.  First, Mr. Sorkin has vastly more experience: he has been a licensed general contractor since 1973,[20] whereas Mr. Adolfo has been licensed only since 2005.[21]  And having served as a liaison between city government and residents in his role as a Community Relations Commissioner for the City of Oxnard between 2014–2020,[22] Mr. Sorkin possesses specialized experience directly relevant to one of the key disputes between the parties – the question of whether certain work at the Property had or had not been permitted.  This Court also notes that as of the date of the evidentiary hearing, Mr. Adolfo's contractor's license had been suspended for failure to comply with an outstanding civil judgment.[23]  Mr. Adolfo testified that the suspension resulted from a payment dispute with a customer, and Creditor did not introduce any evidence regarding the particulars of the outstanding judgment.  This Court does not afford a great deal of weight to the fact that Mr. Adolfo's license has been suspended; nonetheless, the suspension does marginally reduce his credibility.

Second, the Sorkin Report detailing repair estimates to the Property is far more detailed than the comparable report prepared by Mr. Adolfo (the "Adolfo Report").[24]  The Sorkin Report is 65 pages long, itemizes in detail each issue at the Property requiring repairs, explains the required repairs extensively, contains citations to applicable building codes for each repair, and includes cost estimates that break out the specific

---

[20]   Sorkin Decl. (dkt. 64) p. 2:2–7.
[21]   Adolfo Decl. (dkt. 71) p. 2 (no line numbering).
[22]   Sorkin Decl. (dkt. 64-1), Ex. A, p. 3.
[23]   Creditor Ex. E (not docketed).
[24]   Dkt. 71, PDF pp. 4–9.

materials and labor required for each repair category.[25]  By contrast, the Adolfo Report is only six pages long, explains required repairs far less precisely than the Sorkin Report, is devoid of any citations to applicable building codes, and lumps costs together in general categories without including a more specific itemized breakdown comparable to that set forth in the Sorkin Report.[26]

The differing repair estimates not previously discussed are summarized in the table below.  Based upon its finding that the Sorkin Report is entitled to greater weight than the Adolfo Report, this Court finds that Mr. Sorkin's estimates of the following repair costs are the appropriate figure to use in computing the Property's value:

| Repair | Sorkin Estimate | Adolfo Estimate |
|---|---|---|
| Restore unpermitted first-floor kitchen to its original condition as a laundry room[27] | $12,009.00[28] | $19,580.00[29] |
| Repair collapsed drain line under living room | $5,365.00[30] | $46,550.00[31] |
| Removed unpermitted downstairs shower room[32] | $11,235.00[33] | $36,850.00[34] |
| Obtain necessary permits and plans | $22,175.00[35] | $45,120.00[36] |

### g. Remaining valuation evidence

In addition to the evidence discussed above, Debtor submitted an appraisal of the Property prepared by S. Mark McCullough,[37] and Creditor submitted an appraisal prepared by Jonathan K. Goldrich.[38]  However, as noted in part "(2)(a)," above, Debtor

---

[25]     *See generally* Sorkin Report (Creditor Ex. C (dkt. 66-3)).
[26]     *See generally* Adolfo Report (dkt. 71, PDF pp. 4–9).
[27]     As discussed in part "(2)(b)," above, this Court rejects Debtor's contention that certain modifications to the Property were unpermitted, finding instead that the required permits had been issued. However, Creditor did not introduce any evidence establishing that permits had been issued authorizing construction of the first-floor kitchen.
[28]     Sorkin Report (Creditor Ex. C (dkt. 66-3)) pp. 7 & 25–26.
[29]     Adolfo Report (dkt. 71) p. 8.
[30]     Sorkin Report (Creditor Ex. C (dkt. 66-3)) pp. 8 & 27.
[31]     Adolfo Report (dkt. 71) p. 8.
[32]     As noted in footnote 27, above, although this Court has rejected Debtor's allegations that certain modifications to the Property were unpermitted, Creditor did not introduce any evidence establishing that permits had been issued authorizing construction of the downstairs shower room.
[33]     Sorkin Report (Creditor Ex. C (dkt. 66-3)) pp. 8 & 29.
[34]     Adolfo Report (dkt. 71) p. 8.
[35]     Sorkin Report (Creditor Ex. C (dkt. 66-3)) pp. 11 & 18.
[36]     Adolfo Report (dkt. 71) p. 8.
[37]     Dkt. 72, Ex. 2 (PDF pp. 6–26).
[38]     Dkt. 65-1.

and Creditor did not meaningfully dispute what the Property would be worth upon completion of the remodeling project, correction of issues caused by Debtor's prior contractor, and correction of unpermitted work.  (In assessing the costs of remodeling, both appraisals accepted the accuracy of estimates contained in a report prepared by Richard Rathcke of McCormick Consulting Group (such report, the "McCormick Report").)[39]  As discussed above, the dispute instead pertained to whether certain modifications to the Property had or had not been permitted and how much it would cost to complete the remodeling.

### h. Conclusion with respect to valuation

Creditor's appraisal, prepared by Mr. Goldrich, values the Property at $950,000.00.[40]  That valuation incorporates both the repair costs set forth in the McCormick Report[41] and the Sorkin Report.[42]

But, based upon incorrect information from Debtor, the Sorkin Report mistakenly assumed that bringing the Property into compliance with permitting requirements made it necessary (x) to replace and regrade the new section of the driveway and construct a new retaining wall (at a cost of $69,944.00) and (y) to return a remodeled bedroom to its original function as a third garage bay (at a cost of $9,016.00) (*see* section "(2)(c)," above).  For the same reason, the Sorkin Report similarly mistakenly assumed that it would be necessary to return the sunroom enclosure to its prior condition as an exterior balcony (at a cost of $11,277.00) (*see* section "(2)(d)," above).  Because the new driveway, new bedroom that replaced the third garage bay, and sunroom enclosure were in fact all permitted, none of these modifications are required.  Accordingly, it is not appropriate to reduce the Property's value by the cost of these unnecessary modifications, which means that the $950,000.00 valuation set forth in Mr. Goldrich's appraisal must be increased by $90,237.00 ($69,944.00 + $9,016.00 + $11,277.00).  Making that adjustment yields a value of $1,040,237.00 ($950,000.00 + $90,237.00).

---

[39]    *See* Rathcke Decl. (dkt. 70) and McCormick Report (dkt. 68, PDF pp. 45–62).
[40]    Dkt. 65-1.
[41]    Dkt. 68, PDF pp. 45–62.
[42]    Creditor Ex. C (dkt. 66-3).

## 3. CONCLUSIONS OF LAW

### a. Jurisdiction, Authority, and Venue

Although the parties have not disputed this Court's jurisdiction and authority to decide the issues presented, this Court has an independent obligation to examine its own jurisdiction and authority.  *See In re Rosson,* 545 F.3d 764, 769 n. 5 (9th Cir. 2008) (overruled on other grounds) (subject matter jurisdiction); *In re Pringle*, 495 B.R. 447, 455 (9th Cir. BAP 2013) (authority under *Stern v. Marshall*, 564 U.S. 2 (2011)).  This Court has no difficulty concluding that it has jurisdiction over this valuation dispute (28 U.S.C. § 1334(b)), that the matters at issue are statutorily "core" (28 U.S.C. § 157(a)), and that this Court has authority under the U.S. Constitution to value the Property.  *See generally In re AWTR Liquidation, Inc.*, 548 B.R. 300 (Bankr. C.D. Cal. 2016).

### b. Effective date of valuation

This Court previously determined that that requiring Debtor to file a Chapter 11 Plan prior to resolution of the valuation dispute would waste time and resources, and that the delays associated with the valuation dispute qualify as "circumstances for which debtor should not justly be held accountable," § 1189(b), thereby warranting an extension of Debtor's deadline to file a Plan.  Debtor's current Plan-filing deadline is April 14, 2026.

"[T]he majority of courts agree that for purposes of determining the amount of a secured creditor's claim in the context of plan confirmation, the relevant collateral should be valued as of the effective date of the plan."  *In re Dheming*, No. 11-56798, 2013 WL 1195652, at *1 (Bankr. N.D. Cal. Mar. 22, 2013) (unpublished disposition).  Recognizing that precisely timing valuation can be difficult as a practical matter, some courts have stated that "the appropriate date for valuation … is a date at ***or near the date*** of confirmation …."  *In re Hales*, 493 B.R. 861, 866 (Bankr. D. Utah 2013) (emphasis added); *see also In re S-Tek 1, LLC*, No. 20-12241-J11, 2021 WL 5860020, at *3 (Bankr. D.N.M. Dec. 9, 2021) (same).

This Court acknowledges the gap between the valuation date set forth in this Memorandum Decision and the likely date of plan confirmation.  This Court does not anticipate that this gap is likely to pose a problem, as no evidence was introduced at the Evidentiary Hearing suggesting that a material change in the Property's value is likely to occur over the recent past or in the next several months.  However, in connection with the future confirmation hearing, all rights are reserved for the parties to introduce evidence showing that circumstances occurring subsequent to the Evidentiary Hearing or subsequent to issuance of this Memorandum Decision have meaningfully affected the Property's value.

**4. CONCLUSION**

For all the reasons set forth above, the value of the Property as of the date of the Evidentiary Hearing is found to be $1,040,237.00.  This Court will prepare and issue a separate order implementing this Memorandum Decision.

###

Date: April 20, 2026

Neil W. Bason
United States Bankruptcy Judge